UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SQRL HOLDINGS LLC, SQRL SERVICE
STATIONS LLC, and STANDARD
DEVELOPMENT COMPANY LLC,                         CASE NO. 24-cv-1797

                              Plaintiffs,

v.
                                                      **COMPLAINT**

        -against-

RIVERSIDE CAPITAL NY LLC,

                              Defendant.
-------------------------------------------------------------------x

Plaintiffs, SQRL HOLDINGS LLC, SQRL SERVICE STATIONS LLC, and STANDARD DEVELOPMENT COMPANY LLC (hereafter referred to collectively as "Borrower" or "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against the Defendant RIVERSIDE CAPITAL NY LLC (hereafter referred to as "Lender" or "Defendant"), allege as follow:

## Nature of the Case

1. This action arises from three usurious loans which Defendant made to Plaintiffs, charging exorbitant interest rates and origination fees, in violation of applicable usury laws, using misleading and oppressive sales techniques.

## Jurisdiction and Venue

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as it is a suit between citizen of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs. Venue is proper in this judicial district under 28

U.S.C. §§ 1391(b)(1) and (b)(2), based on the venue selection clause in the subject agreements.

**Parties**

3. Plaintiff SQRL Holdings LLC is a Florida limited liability company with its principal place of business in Boca Raton, Florida, and is a citizen of the State of Florida for purposes of determining diversity jurisdiction.

4. Plaintiff SQRL Service Stations LLC is a Florida limited liability company with its principal place of business in Boca Raton, Florida, a wholly-owned subsidiary of Plaintiff SQRL Holdings LLC, and a citizen of the State of Florida for purposes of determining diversity jurisdiction.

5. Plaintiff Standard Development Company LLC is an Arkansas limited liability company with its principal place of business in Little Rock, Arkansas, a wholly-owned subsidiary of Plaintiff SQRL Holdings LLC, and a citizen of the State of Florida for purposes of determining diversity jurisdiction.

6. Defendant Riverside Capital NY LLC is a Connecticut limited liability which, on information and belief, has principal places of business in Connecticut and New York, and is a citizen of New York and Delaware for purposes of determining diversity jurisdiction.

**General Allegations**

7. Defendant loaned money to Plaintiffs as a so-called "Purchase and Sale of Future Receivables". The agreements were in fact fraudulent usurious loans with interest

rates in the triple digits, far beyond the maximum rate permissible for a loan under applicable law.

8. Connecticut law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 12%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

9. Defendant styles its transactions as a "purchase of future receivables" as a ruse in order to attempt to avoid the maximum interest rate and other legal protections and requirements that exist for loans. But in fact, the transactions are nothing more than disguised loans, which function as a loan, and as a result, Plaintiff was entitled to the protections afforded to borrowers under applicable state law.

10. Despite the form of the agreements, no sale of receipts ever took place and the forms were merely a sham to evade appliable usury laws. In reality, the transactions were loans that charged interest rates that exceeded more than 100%, rates far greater than the maximum permitted under the appliable usury laws.

11. Defendant markets and collects upon these "purchase of future receivables agreements" as loans. It required Plaintiffs to repay the loans through weekly and daily payments, which were debited from Plaintiffs' bank accounts each day or each week at amounts pre-set by Defendant. The daily or weekly payments were not grounded on any good faith estimate of monies the Plaintiffs and the other individuals, trusts, and entities named as "Merchants" regularly received from customers on their accounts receivables.

3

These periodic payments resulted in the loan being repaid on short terms at annual interest rates well above the threshold that defines usury under state law.

12. Defendant preys on companies which are in immediate need of cash. The loans are unregulated and predatory in nature, because Defendant charges usurious rates and receives a large portion of its revenues from the "origination" fees rather than from the performance of the loan. As trade groups have recognized, the fundamental characteristic of these predatory loans is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Defendant's own marketing materials including its website touts itself as an "alternative to traditional term loans," and falsely states that "the payment amount is based on a percentage of your monthly credit card sales."

13. The reconciliation provisions in the Loans provided an illusory method for reduction in the payments, and the entire arrangement was a sham, because, among other things:

a. The mandated daily and weekly payment amounts were completely arbitrary numbers, fixed by Defendant, without any good faith basis on the monies that the Plaintiffs or the other 38 individuals, trusts, and entities also named as "Merchants" were actually reasonably expected to receive based on an examination of the historical and projected customer payments on accounts receivable, but rather, were fixed by Defendant based primarily on the amount of disguised interest which the Defendant wanted to receive, and the maximum amount the Defendant felt it could extract from Plaintiffs in light of the Plaintiffs' need for cash. The arbitrary nature of these fixed amounts is demonstrated by,

among other things, the communications between Defendant and Borrower negotiating the terms, in which Defendant arbitrarily set and changed the required repayment amounts.

      b.      Defendant was authorized to collect a judgment against the Plaintiffs as well as the 38 other "Merchants" and the guarantors named in the agreements in the event of the Plaintiffs' default, closing of its accounts, sale of the business, or bankruptcy. The agreements provided that all the Merchants and guarantors agreed not to contest or object to any motion for relief from the automatic stay which is triggered by a bankruptcy, thereby, permitting Defendant to proceed to judgment against all of the Merchants and guarantors despite a bankruptcy.

      c.      Plaintiffs were not permitted under the Loan agreements to request a reconciliation more frequently than once per calendar month, regardless of whether its customer payment stream dramatically decreased in the interim.

      d.      Because Defendant was not required to complete the reconciliation for five business days after the request, and because the payments were required daily, if the payments from customers decreased substantially, Plaintiffs would simply be unable to make the daily payments and would automatically be in default, resulting in the full agreed repayment amount to be due and payable in full, well before any reconciliation could be completed or the payment amount adjusted.

      e.      As a pre-condition for the Defendant to even consider a request for reconciliation, Plaintiffs were required to provide the Defendant with "all of Merchant's bank account statements, credit card processing statements, and accounts receivable report,' and such "additional documents" as Defendant may request for all of the entities,

5

individual, and trusts named as a "Merchant."  As a result, as a practical matter, it would be nearly impossible for Plaintiffs to obtain a reconciliation, due to the nature of the revenues which Plaintiffs receive from their customers, which consist mainly of small customer credit card payments, and therefore, producing all of the records including credit card slips and statements relating to past and outstanding amounts owed to Plaintiffs and the other 38 entities, trusts, and individuals named as "Merchants" would be impossible as a practical matter.

      f.      The entire arrangement was a sham because Defendant knew that, at any moment, it could declare a default and call for the full amount of the agreed repayment amount to be paid in full, because Defendant knew that Plaintiffs were in default at the moment they signed each loan agreement.  As Defendant well knew, simultaneously with each loan agreement with Defendant Riverside Capital NY LLC, Plaintiffs were entering into an additional mirror similar loan agreement for a similar amount with a different similar lending company that worked together with Defendant, and the mirror agreement gave the other lender a lien on the Plaintiffs' accounts receivables.  Defendant knew this because Defendant was coordinating and making the arrangements for both loans.  Defendant also knew that its loan agreement contained an "anti-stacking" provision, which specifically prohibited Plaintiffs from granting any other company a security interest in its accounts receivables.  As a result, Defendant knew that from day one that Plaintiffs were in default on the loan from the moment Plaintiffs entered into the loan agreement, and that Defendant could declare a default and call for the full amount of the agreed repayment amount to be paid in full.  As such, Defendant knew that it was not taking any risk

whatsoever associated with any decrease in the flow of monies from customers because Defendant knew that it could declare a default at any time based on the violation of the anti-stacking provision, regardless of the customer revenue stream.

14. In addition, Defendant deducted exorbitant fees from the amounts it promised to loan the Plaintiff, including among other things, excessive "underwriting" and "origination" fees up to a whopping 43% of the amount of the loan. These fees had no relation to actual expenses incurred by Defendant in connection with the making of the loan, and instead, were simply a further disguised interest charge.

15. Defendant generated further "fees" for itself, by dangling further loans in front of Plaintiff, when it saw that Plaintiff was an easy target because of its financial distress, and then requiring Plaintiff to roll over the amounts unpaid on the prior agreed repayment amount into the new loan, and then insisting Defendant be permitted to pay the promised amounts in a delayed manner, and charging further exorbitant underwriting fees in connection with the new usurious loan.

16. When it made the December 2023 loan, Defendant refused to pay the full amount at closing, and instead insisted on a payment schedule. And then it breached its own payment schedule. Knowing that Plaintiffs needed the cash, Defendant inexplicably failed and refused to make the payments according to the agreed schedule, and instead paid the second installment more than 4 weeks late, hurting the Plaintiffs' cash position and driving the need for the Plaintiffs to take out a further usurious loan with more exorbitant underwriting fees.

17. In a true factoring agreement, the factor purchases an identified set of accounts receivable, and takes the risk that these identified customers do not pay their bills. The "purchase price" is calculated based upon the assessment of the value or collectability of the merchant's receivables.

18. Here, the "purchase price," the repayment amount, and the schedule and amount of loan repayments, were unilaterally dictated by the Defendant based upon the interest rate it wanted to be paid.

19. In a true factoring agreement, if a merchant receives a lower amount of payments from customers, the factor would automatically only be allowed to deduct the agreed percentage of the monies actually coming in.

20. In the merchant cash advance agreement like the one at issue in this case, there are no specified or identified receivables. The Defendant is not taking any risk associated with the failure of the customers to make payments, because it can declare a default and obtain a judgment against the Plaintiffs and each of the other persons and entities named as "Merchants" and the guarantor for the full amount of the agreed repayment amount, even if the company stops doing business because it becomes unprofitable for reasons that might not have any relation to the level of customer payments.

21. The absurdity of the entire arrangement is further demonstrated by the fact that, as a condition for the loan, the Defendant required the Plaintiffs to sign on behalf of more than 38 other entities, individual, and trusts, named as "Merchants."

22. For many years, unscrupulous and unregulated merchant cash advance lenders operated under the radar of regulators. That changed in recent years largely as the

result of a November 20, 2018 *Bloomberg News* report, the first in a series of groundbreaking news articles exposing the abuses of the predatory merchant cash advance lending industry.

23. Regulators have taken action. On July 31, 2020, the New York Attorney General brought suit against a group of merchant cash advance lending companies, as well as their principals, which resulted in a recent court decision finding the transactions were illegal loans. *People by James v. Richmond Cap. Grp. LLC*, 80 Misc. 3d 1213(A), 195 N.Y.S.3d 637 (N.Y. Sup. Ct. 2023). The Securities and Exchange Commission, the Federal Trade Commission, and other state regulators have taken similar legal action against merchant cash advance lenders.

24. The courts have followed suit. In recent years, state and federal courts have upheld claims that similar merchant cash advance agreements, like the ones which are the subject of this lawsuit, are nothing more than disguised illegal usurious loans. *See, e.g, Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023); *S&M Indus., LLC v. Advantage Platform Servs., Inc.*, 80 Misc. 3d 1203(A), 194 N.Y.S.3d 464 (N.Y. Sup. Ct. 2023); *Haymount Urgent Care PC v. Gofund Advance, LLC*, 609 F.Supp.3d 237 (S.D.N.Y. 2022); *AKF, Inc. v. W. Foot & Ankle Ctr.*, 632 F.Supp.3d 66, 79 (E.D.N.Y. 2022); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F.Supp.3d 402, 418–19 (S.D.N.Y. 2022); *Lateral Recovery LLC v. Queen Funding, LLC*, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022); *Davis v. Richmond Cap. Grp., LLC*, 194 A.D.3d 516, 150 N.Y.S.3d 2 (1st Dept. 2021); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., Inc.,* 374 F.Supp.3d 361,

367 (E.D. Pa. 2019) (upholding usury and RICO claim against merchant cash lender under Texas law); *McNider Marine, LLC v. Yellowstone Capital, LLC*, 2019 WL 6257463, 2019 N.Y. Slip Op. 33418(U) (Erie S. Ct.); *US Connect, LLC v. Capital Solutions Bancorp LLC,* 2013 WL 4401840 (M.D. Fla. 2013) (upholding usury and deceptive trade practice claims against merchant cash lender under Florida law).

**November 2023 Riverside Loan Agreement**

25. On about November 28, 2023, Plaintiffs entered into a purported "Purchase and Sale of Future Receivables" agreement with Defendant ("November 2023 Riverside Loan Agreement").

26. Under the terms of the November 2023 Riverside Loan Agreement, Defendant agreed to loan Plaintiffs $500,000, minus unspecified fees, resulting in an actual loan of $450,000.

27. In return, Plaintiffs agreed to repay Defendant the sum of $750,000 to be paid in payments of $115,000 per week, over a 6.5 week or 45-day period.

28. As such, Defendant was to receive $750,000, including $300,000 in disguised interest (including the unspecified fees), over a period of 45 days, on the $450,000 which it actually loaned, resulting in an annual interest rate of more than 324%.

29. In accordance with the November 2023 Riverside Loan Agreement, Plaintiffs made 5 weekly payments to Defendant, which were automatically deducted from their bank accounts, and the remaining amount was rolled over into the December 2023 Riverside Loan Agreement.

**December 2023 Riverside Loan Agreement**

30. On December 27, 2023, Plaintiffs entered into a purported "Purchase and Sale of Future Receivables" with Defendant ("December 2023 Riverside Loan Agreement").

31. Under the terms of the December 2023 Riverside Loan Agreement, Defendant agreed to loan Plaintiffs three million dollars ($3,000,000), minus an unspecified amount of "fees", minus $290,000 which it claimed was still owed under the November 2023 Riverside Loan Agreement. The December 2023 Riverside Loan Agreement did not even specify the exact amount of the "fees" it was going to deduct, but the loan agreement permitted it to charge up to 43% of the $3,000,000, or $1,290,000, which it apparently did. Accordingly, it was promising to loan $3,000,000 minus the $1,290,000 origination and underwriting fees, and minus the $290,000 which was still owed on the November 2023 Riverside Loan Agreement, for a total actual loan amount of $1,420,000.

32. Defendant refused to pay the full amount of the loan at closing and instead insisted that the $1,420,000 loan amount would be paid to Plaintiffs according to a delayed payment schedule, rather than upon signing the loan agreement, but it refused to adjust the weekly repayment amount or schedule. The delayed funding schedule provided for a partial payment on signing, and subsequent payments every three weeks thereafter. Again, the agreement did not even specify the exact amount of each of the installments after the fees.

33. In return, Plaintiffs agreed to repay Defendant the sum of $4,500,000 to be paid in payments of $173,000 per week, over a 26-week period.

34. As such, Defendant was to receive $4,500,000 on a loan of $1,710,000 (taking into account the presumed "underwriting" and "origination fees", and including the roll-over amount), in 26 weeks, resulting in an interest payment of $2,790,000, and an annual interest rate of 124%.

35. In accordance with the December 2023 Riverside Loan Agreement, Plaintiffs made 7 weekly payments of $173,000 to Defendant from January 3, 2024 to February 14, 2024, deducted automatically from their bank accounts. The remaining balance was rolled over into a new February 2024 agreement.

36. Defendant paid the Plaintiffs a first loan installment of $750,000 on signing the agreement on December 29, 2023, but it breached the agreement by unjustifiably failing to pay the subsequent installment of $500,000 until February 15, 2024 (4 weeks later than promised, thereby causing further financial harm to Plaintiffs), and it paid an additional $600,000 on February 29, 2024.

**February 2024 Riverside Loan Agreement**

37. On February 28, 2024, Plaintiffs entered into a purported "Purchase and Sale of Future Receivables" agreement with Defendant ("February 2024 Riverside Loan Agreement"). (The three loans, including the November 2023 Riverside Loan Agreement, the December 2023 Riverside Loan Agreement, and the February 2024 Riverside Loan Agreement are jointly referred to as the "Loans").

38. Under the terms of the February 2024 Riverside Loan Agreement, Defendant agreed to loan Plaintiffs $3,150,000, minus $2,435,000 still owed on the prior Loans, and minus any additional "underwriting" or "origination" fees which were

unspecified in the February 2024 Riverside Loan Agreement (presumed to be $115,000 based on the amount actually loaned, resulting in a new loan payment of $600,000.

39. In return, Plaintiffs agreed to repay Defendant the sum of $4,725,000 to be paid in payments of $50,000 per business day, over a period of 94.5 business days, or 13.5 weeks. As a result, Defendant would receive $4,725,000 on a loan of $3,035,000 (assuming a $115,000 "underwriting fee" and including the rolled over amount), in 13.5 weeks, resulting in an interest payment of $1,690,000, and an annual interest rate of 138%.

40. In accordance with the February 2024 Riverside Loan Agreement, Plaintiffs made 10 daily payments to Defendant of $50,000 each.

## **COUNT I**
(Usury)

41. Plaintiffs repeat and reallege the general allegations as if fully set forth herein.

42. Connecticut law provides that no person or corporation shall "directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum" (Conn.Gen.Stat. § 37-4); that no person or corporation shall "charge a borrower with any expense of inquiry as to his financial responsibility or expense of negotiating a loan . . . unless the total of such charges and of the interest agreed upon is, during any one year, twelve per cent of the loan or less," (Conn.Gen.Stat. § 37-6); and that "no action shall be brought to recover principal or interest, or any part thereof", on any loan so prohibited, "or upon any cause arising from the negotiation of such loan." (Conn.Gen.Stat. § 37-8).

13

43. Lender did charge, demand, accept and make an agreement to receive interest from Borrower at a greater rate than twelve per cent per annum, and charged charged Borrower with expenses even though the charges and interest agreed upon was more than twelve per cent per annum.

44. Lender acted with specific, unlawful, usurious intent, in that it intended to exact a payment beyond the statutory limit.

WHEREFORE, Plaintiffs respectfully request that this Court enter a Judgment against the Defendant for:

A) A declaration that the Loans were usurious, void and unenforceable, and that the guarantees by extension are void and unenforceable;

B) Cancellation of any UCC liens filed by Defendant against the collateral of the Plaintiffs and the other parties named as "Merchants" in the Loan agreements;

C) A money judgment for the monies paid by Borrower, including but not limited to the principal and interest;

D) Injunctive relief to enjoin Defendant from taking any action to enforce or collect upon the Loans or the guarantees;

E) Prejudgment interest, costs, and attorney's fees; and

F) Such further relief as the Court may deem just and proper.

## COUNT II
(Connecticut Unfair Trade Practices Act)

45. Plaintiffs repeat and reallege the general allegations as if fully set forth herein.

46. The Connecticut Unfair Trade Practices Act makes ("CUTPA") it unlawful for a business to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. C.G.S.A. § 42-110b.

47. In determining whether a practice violates CUTPA, a court may examine the extent to which 1) the practice, without necessarily having been previously considered unlawful, offends public policy; 2) whether the practice is immoral, unethical, oppressive, or unscrupulous; or 3) whether it causes substantial injury to consumers or businesses. A party need not prove an intent to deceive, defraud or to mislead, to prevail under CUTPA. It is not necessary to find all three factors, and any one criteria present to a great extent might demonstrate an unfair practice. The expansive nature of the statute provides a remedy for a wider range of business conduct than does the common law, and a CUTPA claim may exist wholly independent of any common law claim.

48. A party prevailing in a CUTPA action shall be entitled to declaratory, injunctive and other equitable relief, monetary relief, punitive damages, and attorney's fees and costs. C.G.S.A. § 42-110g.

49. Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of CUTPA, by, among other things, employing misleading and oppressive tactics to induce Plaintiffs to enter into usurious loans with exorbitant interest rates and fees, and by making and entering into such loans with Plaintiffs and other businesses.

50. Plaintiffs suffered substantial damages from the Defendant's practices, that were not outweighed by the benefits of the practices.

51. Punitive damages should be assessed against Defendant because the Defendant acted with a reckless indifference to the rights of others or an intentional and wanton violation of those rights.

WHEREFORE, Plaintiffs respectfully request that this Court enter a Judgment against the Defendant for:

A) A declaration that the Loans are void and unenforceable, and that by extension the guarantees are void and unenforceable;

B) Cancellation of any UCC liens filed by Defendant against the collateral of the Plaintiffs and the other parties named as "Merchants" in the Loan agreements;

C) A money judgment for the monies paid by Borrower, including but not limited to the principal and interest;

D) Injunctive relief to enjoin Defendant from taking any action to enforce or collect upon the Loans or the guarantees;

E) Punitive damages to punish and deter future similar conduct;

F) Prejudgment interest, costs, and attorney's fees under C.G.S.A. § 42-110g; and

G) Such further relief as the Court may deem just and proper.

## COUNT III
(Unjust Enrichment)

52. Plaintiffs repeat and reallege the general allegations as if fully set forth herein.

53. A party is entitled to recovery for unjust enrichment where the defendant benefitted from the transaction or has received something of value, and the benefit was unjust, to the detriment of the plaintiff. The right of recovery is essentially equitable, its basis being that in a given situation it is contrary to equity to and good conscience for one to retain a benefit which has come to him at the expense of another.

54. Plaintiffs are entitled to recovery for unjust enrichment against the Defendant, because Defendant benefitted from the Loans, and the benefit was unjust, to the detriment of Plaintiffs, and it is contrary to equity and good conscience for Defendant to retain this benefit.

WHEREFORE, Plaintiffs respectfully request that this Court enter a Judgment against the Defendant for:

A) A money judgment for the monies paid by Borrower to Defendant;

B) Prejudgment interest and costs; and

C) Such further relief as the Court may deem just and proper.

### COUNT IV
(Breach of Contract)

55. Plaintiffs repeat and reallege the general allegations as if fully set forth herein.

56. Defendant entered into the loan agreements with Plaintiffs under which it agreed to loan Plaintiffs specific sums of money at agreed times.

57. Defendant breached the Loans by, among other things, deducting amounts from the Plaintiffs' accounts that were not consistent with the terms of the Loan

agreements, changing the schedule for making the agreed Loan, and failing to make the Loans in the agreed amounts at the agreed times.

58. Defendant's breach of the Loans caused damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court enter a Judgment against the Defendant for:

A) A money judgment for the amount by which Plaintiffs were damaged;.

B) Prejudgment interest and costs; and

C) Such further relief as the Court may deem just and proper.

Dated: New York, New York
March 11, 2024

GALLET DREYER & BERKEY, LLP

By: /s/David T. Azrin
David T. Azrin

845 Third Avenue, 5th Floor
New York, New York 10022
(212) 935-3131
dta@gdblaw.com

Attorneys for Plaintiffs